NOTICE
Decision filed 01/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 200115-U

NO. 5-20-0115

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 10-CF-1007 |
| | ) | |
| JAMES CHERRY, | ) | Honorable |
| | ) | Stephen P. McGlynn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice McHaney and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of the trial court denying defendant's postconviction petition after a third-stage evidentiary hearing where the defendant failed to demonstrate prejudice due to ineffective assistance of trial counsel.

¶ 2    On March 23, 2011, the defendant, James Cherry, was found guilty of one count of armed violence in violation of section 33A-2(b) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/33A-2(b) (West 2010)) and one count of aggravated battery in violation of section 12-4.2(a)(1) of the Criminal Code (*id.* § 12-4.2(a)(1)). At sentencing, the convictions were merged, and the defendant was sentenced to 25 years' incarceration within the Illinois Department of Corrections (IDOC) on the armed violence conviction.

¶ 3    The defendant filed a petition for postconviction relief on March 21, 2017. The petition proceeded to a third-stage evidentiary hearing on September 20, 2019, and the trial court issued a

1

written order denying the defendant's petition on March 10, 2020. The defendant now appeals the judgment of the trial court denying his postconviction petition arguing that the trial court erred in concluding that trial counsel's errors did not prejudice the defendant. For the following reasons, we affirm the judgment of the trial court denying the defendant's postconviction petition.

¶ 4                                    I. BACKGROUND

¶ 5      On November 1, 2010, the defendant was charged with one count of armed violence (*id.* § 33A-2(b)) and two counts of aggravated battery with a firearm (*id.* § 12-4.2(a)(1)). The charges stem from a shooting incident that occurred on October 31, 2010, at a parking lot in East St. Louis, Illinois, and resulted in an individual being injured. The evidence produced at trial is summarized in our decision in *People v. Cherry*, 2014 IL App (5th) 130085, ¶¶ 3-5, *rev'd in part*, 2016 IL 118728, ¶ 35, and will not be restated here in the interest of brevity. Any evidence presented at trial, relevant to this appeal, will be set forth in our analysis below.

¶ 6      Prior to trial, the State dismissed one count of aggravated battery with a firearm, and on February 2, 2011, the State filed a notice of intent to seek an extended-term sentence as the charged offenses were committed with a firearm with an attached laser sight (see 730 ILCS 5/5-5-3.2(b)(6) (West 2010)). Upon completion of a jury trial on March 23, 2011, the defendant was found guilty of one count of armed violence and one count of aggravated battery. The jury also found that the defendant had committed the offense of armed violence with a firearm attached with a laser sight.

¶ 7      The defendant filed a posttrial motion on April 6, 2011, and the motion was denied at the sentencing hearing on July 6, 2011. At sentencing, the defendant's convictions were merged, and the defendant was sentenced to 25 years' incarceration within the IDOC on the armed violence conviction. The defendant filed a motion to reconsider the sentence on August 4, 2011, which was denied by the trial court after a hearing on December 7, 2011.

2

¶ 8    Prior to sentencing, on June 30, 2011, the defendant had sent correspondence to the trial court alleging the "poor performance of my attorney." The defendant alleged that trial counsel had a conflict of interest; failed to conduct any type of investigation or collect any evidence; failed to interview eyewitnesses; failed to file a motion to exclude evidence; failed to communicate with the defendant or his family; failed to discuss the court proceedings, options of case strategies, or possible plea agreements; and, failed to prepare the defendant to testify at trial. The defendant further alleged in his correspondence that the State acted in bad faith by failing to preserve the two vehicles that were present at the incident for examination by the defendant, and that such evidence was essential to proving the defendant's self-defense claim. On January 5, 2012, the trial court filed an order granting the defendant a hearing on his *pro se* correspondence regarding his claim of ineffective assistance of trial counsel.

¶ 9    On January 16, 2013, the trial court conducted a *Krankel*[1] hearing regarding the defendant's claim of ineffective assistance of trial counsel. The defendant was present and represented by new counsel (posttrial counsel) at the hearing. Along with the allegations in the defendant's correspondence, posttrial counsel also argued that trial counsel failed to investigate the defendant's medical records that demonstrated that the defendant was not under the influence of alcohol at the time of the incident. No witnesses were called, nor was any evidence admitted by either party at the hearing. The trial court heard arguments and, upon completion of arguments, held that the defendant had failed to demonstrate a reasonable probability that any errors committed by trial counsel would have substantially changed the outcome of the case. Thus, the trial court found that the defendant had failed to show prejudice and denied any relief.

---

[1]*People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, mandate a preliminary inquiry, commonly referred to as a *Krankel* hearing, into the factual basis of a defendant's *pro se* claim that trial counsel provided ineffective assistance of counsel.

3

¶ 10    The defendant appealed his conviction, and on December 10, 2014, this court vacated the defendant's conviction based upon a finding that the armed violence statute prohibited the use of aggravated battery with a firearm as a predicate offense for armed violence. *Cherry*, 2014 IL App (5th) 130085, ¶ 31, *rev'd in part*, 2016 IL 118728, ¶ 35. The defendant also raised ineffective assistance of posttrial counsel on appeal and this court found that the defendant had not demonstrated that he had received ineffective assistance from his posttrial counsel at his *Krankel* hearing. *Id.*

¶ 11    The State appealed this court's decision, and our supreme court affirmed in part and reversed in part on September 22, 2016. *People v. Cherry*, 2016 IL 118728, ¶ 36. Our supreme court held that the defendant was properly convicted of armed violence predicated on aggravated battery, and that the defendant failed to establish that he had received ineffective assistance from posttrial counsel at his *Krankel* hearing. *Id.* ¶ 35. As such, the supreme court reversed this court with regard to the defendant's armed violence conviction, affirmed this court with regard to the defendant's claim of ineffective assistance of posttrial counsel, and affirmed the circuit court's judgment in its entirety. *Id.*

¶ 12    On March 21, 2017, the defendant, through retained counsel, filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). The petition alleged that trial counsel provided ineffective assistance of counsel as follows:

(1) failed to have the defendant examined for post-traumatic stress disorder or another mental defect based on the defendant's military service;

(2) failed to interview potential witnesses;

4

(3) failed to seek any action regarding the State's spoilation of evidence with regard to the defendant's vehicle that precluded the defense from obtaining a bullet from the vehicle that could have potentially demonstrated that another weapon was fired at the scene which would have aided in the defendant's self-defense claim;

(4) failed to aggressively cross-examine witnesses and challenge their allegations indicating to the jury that he "only asks stupid questions";

(5) failed to seek a continuance of the trial when he was unprepared as indicated by trial counsel's admittance that he never spoke with the State's key witnesses prior to trial;

(6) failed to make reasonable efforts to establish a basis for self-defense;

(7) failed to seek a ballistic expert to challenge the testimony of the State's expert;

(8) failed to present defendant's medical records demonstrating that the defendant was sober at the time of the incident;

(9) failed to request the toxicity report of the victims;

(10) allowed the exclusion of all black jurors over the objection of the defendant;

(11) failed to adequately *voir dire* the jury panel on the defense of self-defense;

(12) failed to object to the State asking leading questions on critical issues;

(13) failed to challenge the identification of the defendant by witnesses when the defendant's contact with the witnesses was minimal;

5

(14) failed to interview any of the patrons of the night club or the friend that the defendant was with that night to establish the defendant's state of mind prior to the shooting;

(15) failed to interview law enforcement members, that were at the scene, prior to trial;

(16) failed to disclose a conflict of interest based on trial counsel's representation of a close associate of the victim's family;

(17) refused to seek a bond reduction;

(18) failed to investigate claims of vehicle break-ins in the area of the incident;

(19) failed to prepare the defendant for cross-examination;

(20) failed to object to the admissibility of an ammunition clip found in the back seat of the defendant's vehicle;

(21) failed to challenge that law enforcement did not inventory or preserve evidence in the other vehicles at the scene, particularly, but not limited to, the victim's sister's vehicle;

(22) refused to meet with the defendant or keep him advised of trial issues;

(23) failed to convey plea offers;

(24) failed to raise the issue that the owners of the other vehicles in the lot at the crime scene were not contacted, vehicles were moved, and evidence was not entirely preserved in the lot; and,

(25) failed to call, interview, or subpoena a witness to the incident.

6

¶ 13    The postconviction petition also noted that, following the jury trial, a number of the witnesses and members of law enforcement were convicted of criminal offenses and the evidence of such corruption would have affected the credibility of these witnesses. The defendant further asserted a claim of actual innocence based on self-defense, arguing that if the bullet that was potentially lodged in the door of his vehicle had been determined to be from a different weapon, it would have established self-defense, but that the actions of the State and trial counsel prevented this key evidence from being heard by the jury. Finally, the defendant alleged ineffective assistance of appellate counsel for failing to raise the above issues on the defendant's direct appeal. There were no affidavits, records, or other evidence attached to the defendant's petition.

¶ 14    The State filed a motion to dismiss the defendant's postconviction petition on August 21, 2017, alleging, *inter alia*, that the defendant's claims were barred by *res judicata* and/or were procedurally forfeited, and that the defendant's petition failed to provide or attach any evidence not contained in the record. The trial court entered a written order on January 22, 2018, stating that it had found that the defendant's petition, if taken as true, made a substantial showing of a constitutional violation concerning ineffective assistance of counsel and spoliation of evidence. As such, the trial court denied the State's motion to dismiss. The trial court's order also stated that the defendant's allegations concerning the subsequent criminal convictions of the trial judge, certain members of law enforcement, and witnesses, did not rise to the level of a constitutional violation since the convictions were unrelated to the defendant's case. The trial court's order did not address the State's arguments regarding forfeiture and/or *res judicata*, or the petition's lack of any supporting documentation outside of the record.

¶ 15    On August 6, 2018, the defendant filed a motion for substitution of counsel that was granted by the trial court the same day. The matter was then scheduled for a third-stage evidentiary hearing

which was conducted on September 20, 2019. The defendant was present and represented by appointed counsel. At the beginning of the hearing, the parties entered numerous stipulations, including, but not limited to, the following:

    (a) That on October 31, 2010, the East St. Louis Police Department seized a 2006 Dodge Nitro SUV belonging to the defendant and that on January 13, 2011, the defense was granted access to the 2006 Dodge Nitro to inspect and photograph it. No reports from the inspection are available. The defense investigator has since died. The state's attorney investigator has no memory of the events of the day they went to investigate the vehicle.

    (b) That the victim's medical records indicated that he had 103 milligrams per deciliter of ethanol in his serum. The defendant's medical records demonstrate that he was taken to the hospital for diagnosis and treatment of injuries sustained during his arrest—head contusion, facial contusion, facial abrasion, knee abrasion, knee contusion, leg abrasion, leg contusion, and abdominal wall contusion. The defendant was also tested, and no ethanol was found in his system.

¶ 16    The defense then called the defendant's trial attorney, Paul Storment, to testify. Storment testified that he is an attorney licensed in the State of Illinois, and had been practicing law since 1991. He stated that he had represented the defendant since the defendant's initial arraignment, or shortly prior to the arraignment, and that he had discussed the case in general with the defendant, to include how the case would likely proceed. At the first meeting with the defendant, Storment stated that he had the defendant recount everything he remembered about the night of the occurrence that led to the charges.

¶ 17    Storment testified that the defendant stated that he would not entertain any offers from the State since he believed it to be an incident of self-defense. Storment also stated that the defendant did not want to present post-traumatic stress disorder (PTSD), or anything psychological related to his military service, stating that "there's nothing wrong with me." Storment testified that he informed the defendant regarding the refusal to entertain an offer in terms of the overall theory and strategy of the case. Storment testified that he also explained to the defendant the potential sentencing ranges on the charges, including the enhancement based on the laser sight, and that the defendant was "looking at a lot of time."

¶ 18    Storment testified that he did not file any pretrial motions, but hired an expert[2] to examine the defendant's vehicle, specifically, the bullet hole in the side of the defendant's vehicle.[3] Storment stated that the expert went to the tow lot, along with a representative from the state's attorney's office, but upon arrival, they discovered that the vehicle was not there. Employees of the tow lot informed them that the owner of the tow lot had been driving the defendant's vehicle since the day it had been towed. The expert contacted Storment with that information and Storment stated that the information "kind of freaked me out" because some of the issues that he wanted to use at trial were going to be negated. Storment stated that he made an offer of proof regarding the defendant's vehicle on the first day of trial, and that the State had agreed that the vehicle had been removed from the tow lot and that its location was unknown at the time that the defense attempted to have it inspected.

¶ 19    Storment testified that the defendant's vehicle was in the State's possession and was being held as evidence. As such, Storment stated that he believed that the chain of custody had been

---

[2]Storment identified the name of the expert, but did not state his area of expertise.
[3]There was testimony at trial from a crime scene investigator, who responded on the night in question, that he had taken photographs of the entire scene, including photographs of the defendant's vehicle which appeared to have a bullet hole defect in the front driver's door.

tainted since the vehicle was not at the location where the vehicle had been towed. Storment stated that he made no effort to locate the vehicle after the expert's attempt to inspect it since the defendant's defense of self-defense was based on the defendant's assertions that the individuals present at the scene were messing with his vehicle, trying to "jimmy it open" to steal property out of the vehicle, or steal the vehicle itself. Stormant stated that, even if the vehicle had been found, there would be no way to determine whether any damage on the vehicle occurred at the time of the incident or subsequent thereto. Storment further stated that if the vehicle had been located, and a bullet found, there was also a possibility that testing could have determined that the bullet actually came from the defendant's weapon, thus, eliminating any self-defense argument. So, Storment stated it was a matter of trial strategy not to pursue the vehicle.

¶ 20    Storment testified that he did not hire any other forensic expert, but did argue at trial, that the odd angle of the bullet hole in the defendant's vehicle was such that the bullet could have been fired by someone other than the defendant. He stated that he also argued that people left the scene prior to or shortly after the police arrived, including the individual that defendant alleged fired at him from behind the trunk of her vehicle and then threw the gun in the trunk. Storment stated that her vehicle was never inspected or inventoried; however, every individual involved in the incident testified at trial that they did not have a weapon. This same woman also testified that the defendant had shot his own vehicle, but that information was not in her statement to law enforcement at the time of the incident. When asked, Storment testified that he did not point out that inconsistency at trial, nor did he point out that bullet trajectory was not as she described. Storment stated, hypothetically, that if the defendant's vehicle had been found at the home of the owner of the tow lot and a bullet had been recovered, he could have probably admitted it into evidence, but again, if the bullet turned out to be from the defendant's gun, then self-defense would have been defeated.

10

¶ 21    Storment also testified that he did not request any funds from the trial court to obtain a ballistics expert since, other than the potential bullet in the defendant's vehicle, all other bullets and shell casings matched the defendant's gun. Storment stated that he somewhat recalled that the crime scene investigator, Michael Grist, testified about ballistics at trial, but that Storment could not recall whether Grist had any specialized training in bullet trajectory, or casing trajectory. Storment stated that he knew Grist had some firearms training and generally understood how the defendant's gun worked.

¶ 22    Storment stated that he made no attempt to obtain the defendant's medical records, even though he was aware of the fact that the defendant had been beaten at the time of his arrest and taken to a hospital to receive medical attention. Storment also testified that the search of the defendant's vehicle was without a warrant, and that the black ammunition magazine, along with other items, were seized during an inventory search. Storment acknowledged that he did not file a motion to suppress with regard to anything seized from the defendant's vehicle.

¶ 23    Storment stated that he had prepared the defendant to testify at trial by talking to him in general about being asked direct questions, the State's opportunity to cross-examine him, and the specific issues that Storment believed the State would focus its questioning. He also advised the defendant on general things such as "don't lose your temper." Storment testified that he could not recall whether he conveyed to the State that the defendant was a combat veteran.

¶ 24    When asked if he felt he was prepared for trial, Storment stated that, given the facts as they were, he did not think he could have done much more, but later stated that he could have "probably always done more." Storment acknowledged that he did not look at spoliation of evidence with regard to the defendant's vehicle or consider if it could be grounds to file a motion to dismiss, even though the trial court provided him with additional time to look into the issue. Storment stated that

11

he did not recall informing the trial court that he believed that the spoilation issue did not meet the level of a due process violation, but further stated that he felt like "pushing this issue could have had a deleterious effect as well." Storment testified that there was no testimony presented by either party, regarding the fact that the defendant's vehicle had been driven around and not preserved as evidence.[4]

¶ 25    Storment further stated that the defendant had informed him that the East St. Louis police were beating him unnecessarily, and that the law enforcement officers at the scene knew the witnesses. Storment stated that he cross-examined Officer Carpenter, who was the initial responder at the scene, if he knew the victim's sister and Officer Carpenter stated that they had gone to high school together. Storment testified that he attempted to impeach the witnesses' versions of events regarding the trunk of the car that the defendant claimed was the location where someone fired at him, and also regarding a ladder that was extremely close to the defendant's vehicle and the witnesses' testimony that the defendant walked around his vehicle without hitting or tripping on the ladder.

¶ 26    Next, the defendant testified on his own behalf. The defendant stated that he had been incarcerated in IDOC for nine years. The defendant testified that he had hired Storment after he discovered his initial attorney was related to one of the individuals involved in the incident. The defendant stated that he had met with Storment approximately three times during the course of the proceedings. The first time was to provide Storment with a check, which was prior to his indictment, and then two times after that before going to trial. The defendant stated that Storment never informed him regarding a speedy trial, other than Storment did not want to proceed with a

---

[4] On the first day of trial, based on the State's motion *in limine* that argued the vehicle being moved was not relevant, the trial judge excluded the testimony of the state's attorney's investigator, who was summoned by the defense, and would have testified that an attempt was made by the defense to inspect the vehicle but that the inspection could not be conducted since the vehicle was no longer at the tow lot.

speedy trial. The defendant testified that he informed Storment that he was innocent and wanted to proceed. The defendant stated that Storment did not say that he needed more time to investigate the charges. The defendant stated that Storment showed him the police report, and instead of listening to the defendant's version of events, went off the State's theory regarding the incident.

¶ 27     The defendant testified that Storment encouraged a PTSD defense, and that the defendant informed counsel that he did not agree with PTSD because his actions were in self-defense. The defendant testified that Storment did inform him what the charges were, but never discussed the sentencing range on the charges and never discussed any negotiating on the charges. Prior to the incident, the defendant testified that he never had any contact with the court system, not even a parking ticket. As such, the defendant stated that he relied completely on the advice of Storment and never rejected any advice that Storment gave him.

¶ 28     The defendant stated that when he was arrested on October 31, 2010, by the East St. Louis Police Department, he was taken to the hospital because he had been beaten by the officers. The defendant stated that he informed Storment of the beating and that Storment observed the defendant's injuries. The defendant testified that he asked Storment to obtain his medical records, but Storment never did. The defendant stated that he paid Storment $10,000 to represent him and that his grandmother provided the money to cover the cost of the expert to inspect his vehicle.

¶ 29     The defendant went on to testify that he asked Storment to obtain a ballistics expert, but that Storment stated that it was not necessary because the State had an expert. The defendant further testified that, to his knowledge, his vehicle has never been located. The defendant stated that he was very adamant about locating the vehicle because he knew that he had been shot at and that the vehicle would prove that. According to the defendant, Storment just kept using all these

13

different theories and would not listen to the defendant saying that he wanted the bullet removed from the vehicle because it would prove what really happened.

¶ 30    No other witnesses were called. Defense counsel then made an offer of proof that four of six law enforcement officers from the East St. Louis Police Department involved in this matter had been indicted and/or convicted federally and/or locally for false statements to federal investigators, theft of evidence, fraudulently obtaining overtime, and other crimes related to veracity. There was no other evidence presented by the defense or the State.

¶ 31    After arguments, the trial court stated as follows:

"I completely understand a lack of confidence in the manner in which [Storment's] representation of [the defendant] played out, both before the trial and it—it looked like any time he had the chance to explore more, he chose just to—I'll just live with what we have here and I'll try to come up with the best argument I can."

¶ 32    The trial court then went on to discuss the standards regarding ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The trial court noted that trial strategy, by and large, should not be second-guessed, and that the State had the burden of proof to prove beyond a reasonable doubt the defendant's guilt, but that the defendant had the burden of proof to prove the affirmative defense of self-defense. The trial court stated that the defendant did not deny that he had a weapon and that he discharged that weapon, but took the position that he was under attack and attempting to defend himself. The trial court then granted the parties 21 days to submit any additional case law and took the matter under advisement.

¶ 33    On March 10, 2020, the trial court entered a written order stating, in its entirety, as follows:

"[The defendant] failed to establish he was prejudiced by trial counsel's deficient performance. See *Strickland*. Defendant also failed to establish how mishandling

14

of vehicle in question prejudiced Defendant. Defendant's request for post-conviction relief is denied. This is a final appealable order under applicable rules."

¶ 34    The defendant now appeals the denial of his postconviction petition arguing that the trial court's denial of his petition was manifestly erroneous. The defendant argues that the trial court agreed that trial counsel failed to investigate and present evidence in support of a defense of self-defense and/or properly challenge the State's failure to preserve potentially exculpatory evidence within its control, yet erroneously determined that trial counsel's deficient performance did not prejudice the defendant. As such, the defendant respectfully requests that this court reverse the denial of his third-stage postconviction petition and remand this matter for a new trial.

¶ 35                                 II. ANALYSIS

¶ 36    The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his or her original trial or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). A postconviction proceeding is not an appeal from an underlying judgment, but rather a collateral attack on the judgment. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). As a collateral proceeding, a postconviction proceeding allows inquiry only into constitutional issues that were not, and could not have been, adjudicated in an appeal of the underlying judgment. *Id.*

¶ 37    The Act sets forth a three-stage process for postconviction proceedings. *People v. Little*, 2012 IL App (5th) 100547, ¶ 12. At the first stage, the trial court independently assesses a defendant's petition and may summarily dismiss the petition if the court determines that it is frivolous or patently without merit. *Id.* If not dismissed at the first stage, the petition advances to the second stage where counsel may be appointed, and the State may move to dismiss the petition. *Id.* At the second stage, the trial court must determine whether the petition contains sufficient

15

allegations of a constitutional violation, and if a substantial showing is made, the petition proceeds to the third stage for an evidentiary hearing. *Id.*

¶ 38 In this matter, the defendant's petition proceeded to the third stage and an evidentiary hearing was conducted on September 20, 2019. A defendant has the burden of proving a substantial constitutional violation at the third stage. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The trial court "may receive evidentiary proof via affidavits, depositions, testimony, or other evidence," at the third-stage evidentiary hearing. *People v. Gerow*, 388 Ill. App. 3d 524, 527 (2009). The evidentiary hearing allows the parties to "develop matters not contained in the trial record and, thus, not before the appellate court." *People v. Lester*, 261 Ill. App. 3d 1075, 1078 (1994).

¶ 39 The trial court serves as the finder of fact at the evidentiary hearing and, as such, it is the trial court's function to determine witness credibility, decide the weight to be given to the evidence, and to resolve evidentiary conflicts. *People v. Brown*, 2020 IL App (1st) 190828, ¶ 43. When a petition is advanced to the third stage and an evidentiary hearing has been conducted involving fact-finding and credibility determinations, we will not reverse a trial court's decision unless it is manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473. A trial court's ruling is manifestly erroneous if it contains an error that is clearly evident, plain, and indisputable. *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002).

¶ 40 First, we need address the State's argument that the issues raised in the defendant's postconviction petition were previously litigated, and/or could have been raised on direct appeal, and therefore, are barred by the doctrine of *res judicata* or procedurally forfeited. The State notes that the defendant brought claims of ineffective assistance of trial counsel that were addressed at

16

the posttrial *Krankel* hearing, and further notes that the defendant's direct appeal addressed a claim of ineffective assistance of posttrial counsel, but did not raise ineffective assistance of trial counsel.

¶ 41　The State also argues that the defendant's postconviction petition raised issues based on the record in this matter, without providing any affidavits, documents, or other evidence outside of the record. As such, the State argues that the defendant's claims are inappropriate for postconviction proceedings.

¶ 42　The defendant counters that, despite the posttrial proceedings in this matter, the trial court advanced the defendant's petition for an evidentiary hearing based on allegations of ineffective assistance of trial counsel that were not fully examined at the *Krankel* hearing. The defendant does not, however, state which allegations and/or claims of ineffective assistance of trial counsel were not fully examined at the *Krankel* hearing.

¶ 43　*Res judicata* applies to all issues considered on direct appeal, and those issues that could have been presented on direct appeal, but were not, are deemed procedurally forfeited. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). The defendant's correspondence raised a claim of ineffective assistance of counsel alleging that his trial counsel had a conflict of interest; was aware that the defendant's vehicle was moved after being impounded; refused to request a bond reduction; did not interview witnesses; failed to call a witness that was at the scene; failed to conduct any type of investigation; did not prepare the defendant to testify; did not obtain a ballistic expert; failed to obtain the defendant's medical records; and, that evidence was not preserved, including the defendant's vehicle, which could have supported his defense of self-defense. At the posttrial *Krankel* hearing, the trial court found that the defendant had not met the prejudice prong of *Strickland*.

17

¶ 44    On direct appeal, the defendant did not assert that the trial court failed to conduct an adequate inquiry into his claims, nor did the defendant raise ineffective assistance of trial counsel. Rather, the defendant alleged that posttrial counsel rendered ineffective assistance of counsel in presenting his claims regarding ineffective assistance of trial counsel. This court found as follows:

> "The defendant's posttrial counsel presented and argued his claims from the letter, as well as an additional claim regarding evidence of the defendant's lack of intoxication. However, we need not address whether the performance was objectively unreasonable, as we can dispose of the defendant's claim because he suffered no resulting prejudice. [Citations.]
>
> * * *
>
> *** The majority of the defendant's claims concern his trial attorney's strategy, which enjoys a strong presumption of competency; for example, whether to call certain witnesses on a defendant's behalf are matters of trial strategy that are generally immune from claims of ineffective assistance of counsel. [Citation.] The remainder of the defendant's allegations regarding his trial counsel are either refuted by the record, present general allegations that are not supported by specific information, or fail to demonstrate how he was prejudiced by the alleged failures. The defendant was entitled to professionally competent assistance, not a perfect attorney or successful representation." *Cherry*, 2014 IL App (5th) 130085, ¶¶ 27, 30, *rev'd in part on other grounds*, 2016 IL 118728, ¶ 35.

¶ 45    The matter then proceeded to our supreme court. Although our decision was reversed in part on other grounds, our finding that the defendant failed to establish that he received ineffective

18

assistance of posttrial counsel at the *Krankel* hearing was affirmed. *Cherry*, 2016 IL 118728, ¶ 35.

In its decision, with regard to *res judicata*, our supreme court noted as follows:

> "Moreover, defendant fears that, having now raised these issues on direct appeal, any
> attempt to develop them in a postconviction petition will be barred by *res judicata*.
>
> Although we do not dispute defendant's characterization of the record, we
> do dispute his assertion that an 'impossible situation' results. It is an altogether
> common occurrence that the viability of a *Strickland* claim will turn on matters
> outside the record. And the legislature has provided a mechanism for dealing with
> that in the Post-Conviction Hearing Act [citation], which specifically allows for the
> raising of 'constitution questions which, by their nature, depend[ ] upon facts not
> found in the record.' [Citation.] Nor is it necessarily the case, as defendant maintains,
> that our rejection of his ineffectiveness claim in this appeal forecloses his ability to
> raise that claim in a properly supported postconviction petition." *Id.* ¶¶ 32-33.

Our supreme court went on to indicate that the defendant's claims could avoid the operation of

*res judicata* by "the collection and presentation of 'affidavits, record, or other evidence' not

contained in the record, just as the Post-Conviction Hearing Act contemplates." *Id.* ¶ 33.

¶ 46 The defendant's postconviction petition, however, did not contain any affidavits, record,

or other evidence not contained in the record. Thus, it was within the trial court's discretion to

grant the State's motion to dismiss on the basis that the defendant failed to provide any

documentation or an explanation for the absence of documentation as required by the Act. See 725

ILCS 5/122-2 (West 2016); *People v. Jackson*, 213 Ill. App. 3d 806, 811 (1991) (it is the

petitioner's burden to support the allegations with affidavits, records, or other evidence). The trial

court, however, elected not to dismiss the defendant's petition at the second stage based on lack of

19

documentation and advanced the matter to a third-stage evidentiary hearing regarding the defendant's claims of ineffective assistance of trial counsel and spoliation of evidence. Thus, regardless of whether the petition contained supporting documentation, the defendant was given the opportunity to develop matters outside of the record at the evidentiary hearing.

¶ 47　At the *Krankel* hearing conducted on January 16, 2013, no witnesses were called, nor was any evidence submitted by either party. As such, there is no record pertaining to several of the defendant's claims, including the defendant's claim that he had requested a ballistics expert, since communication with one's counsel is a matter outside of the trial record. It is also not evident in the record why trial counsel elected to forego obtaining or admitting the defendant's medical records, or failed to pursue any means to locate the defendant's vehicle. See generally *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 55 (nothing in record demonstrates why counsel abandoned the theory promised to the jury in opening statement, making the claim more suitable for collateral proceedings). The defendant developed matters outside the record at the evidentiary hearing by entering into numerous stipulations, and by the testimony of witnesses. Given the specific facts of this case, we find that the defendant's claims, which were in part, based upon the evidence outside of the record developed at the evidentiary hearing, are not barred by *res judicata*, nor procedurally defaulted since those claims could not have been considered on direct appeal.

¶ 48　We will not address which specific claims are barred by *res judicata*, procedurally forfeited, or based upon evidence outside of the record since the trial court's judgment was not based upon any specific findings regarding the defendant's claims and the defendant does not challenge any finding by the trial court regarding a specific claim. Instead, the trial court's judgment was based on its determination that the defendant failed to demonstrate prejudice, and

20

we will proceed with the defendant's sole issue on appeal that the trial court erred in determining that the defendant was not prejudiced by the errors committed by his trial counsel.

¶ 49     In considering this issue of prejudice, the trial court stated as follows:

"The other thing is I have to consider the issue of, all right, if we had the car, if there was—or had [trial counsel] done something else, could it have changed the outcome of this case. And there's two aspects of that. The first aspect is were there pretrial maneuvers that he could have made that really would have changed what would happen at trial or would have forced the State to dismiss its case. That's one question.

The other question is, the jury having heard [the defendant's] version of events, is there something more that—that [trial counsel] should have done that could have changed the outcome of how the jury interpreted or responded to the evidence that it heard.

This is not an easy case. I'm taking this case very seriously. And I— There's some things that I want to read through."

¶ 50     "Establishing prejudice under the *Strickland* inquiry requires a defendant to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Barrow*, 195 Ill. 2d 506, 520 (2001) (quoting *Strickland*, 466 U.S. at 694). The prejudice prong of *Strickland* entails more than an "outcome-determinative" test and requires a defendant to show that counsel's deficient performance rendered the result of the trial unreliable or the proceedings fundamentally unfair. *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

21

¶ 51	In his brief, the defendant argues various avenues in which trial counsel could have approached the spoilation of evidence issue and argues that, if the jurors had heard that the State "bungled a critical piece of defense evidence, and that they could infer it would have been favorable to the defense," there is a reasonable probability that the outcome of the defendant's trial would have been different. The defendant also argues that the evidence at trial was not overwhelming regarding the defendant's guilt, and that there were "some holes in the State's case," to include no motive for the offenses, that vehicles at the scene were never searched for another weapon or burglary tools, and that the defendant surrendered as soon as law enforcement arrived, supporting the defendant's perception that he was no longer under a threat by individuals at the scene once law enforcement was present.

¶ 52	The difficulty with the defendant's arguments regarding trial counsel's approach to the spoilation of evidence issue is that trial counsel testified at the hearing that it was a matter of trial strategy. Although trial counsel stated that the obtainment of the alleged bullet within the defendant's vehicle could have established another weapon at the scene, it could have also established that the bullet was fired from the defendant's weapon, thus, eliminating any self-defense argument. Thus, trial counsel stated that it was his decision not to pursue the vehicle, and instead, attempted to impeach the witnesses' versions of the events

¶ 53	As the trial court noted, it is well settled that the strategic choices made by defense counsel, including which evidence to present and which witnesses to call, are within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and the trial court must give deference

22

to counsel's performance within the context of trial and without the benefit of hindsight. *Strickland*, 466 U.S. at 689.

¶ 54    This court, upon direct appeal, found that the defendant's allegations regarding his trial counsel were matters of trial strategy or "either refuted by the record, present general allegations that are not supported by specific information, or fail to demonstrate how he was prejudiced by the alleged failures." *Cherry*, 2014 IL App (5th) 130085, ¶¶ 27, 30, *rev'd in part on other grounds*, 2016 IL 118728, ¶ 35. Our review of the defendant's claims was based upon the record on appeal, and we do not find that the evidence developed at the evidentiary hearing, outside of the trial record and thus, outside our initial review, established anything beyond trial counsel's reasonings for his trial strategy.

¶ 55    The record reflects that the trial court exercised due diligence in its consideration of the *Strickland* prejudice factor. It stated the factors that it would consider with regard to prejudice and took the matter under advisement. The newly developed evidence failed to overcome the strong presumption that trial counsel's action or inaction was the product of sound trial strategy. See *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). Ultimately, the trial court determined that trial counsel's errors did not result in prejudice to the defendant and this court does not find any error that is clearly evident, plain, or indisputable in that finding. Therefore, we find that the trial court's judgment denying the defendant's postconviction petition was not manifestly erroneous.

¶ 56                                III. CONCLUSION

¶ 57    For the foregoing reasons, we affirm the judgment of the trial court denying the defendant's postconviction petition.

¶ 58    Affirmed.